ESTATE OF MAX RUDIN, FRED D. RUDIN, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Rudin v. Commissioner
Docket No. 960-75.
United States Tax Court
T.C. Memo 1977-212; 1977 Tax Ct. Memo LEXIS 228; 36 T.C.M. (CCH) 886; T.C.M. (RIA) 770212; July 12, 1977, Filed Martin M. Lore, for the petitioner. Peter Matwiczyk, for the respondent. FEATHERSTON
*229 MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined a deficiency of $39,940.74 in petitioner's Federal estate tax. The only issue for decision is whether two intervivos transfers in trust by decedent for the benefit of his daughter-in-law and three grandchildren were gifts made in contemplation of death within the meaning of section 2035. [1]/ FINDINGS OF FACT Decedent Max Rudin died testate on July 26, 1971. Fred D. Rudin, the executor of his estate, was a legal resident of Atlantic Beach, New York, at the time the petition was filed. He filed the Federal estate tax return for decedent's estate with the Internal Revenue Service Center, Andover, Massachusetts. At the time of decedent's death, he was 80 years of age. On February 23, 1969, decedent excuted a will in which he named his son and only child, Fred D. Rudin (Fred), as executor. Under the terms of the will, Fred was to receive decedent's personal effects, and the balance of the estate was to be placed in trust. Under the terms of *230 the trust, Alice Rudin (Alice), Fred's wife, was to be the income beneficiary, and the trustee was to be empowered to invade the corpus of the trust should its income not be sufficient for Alice's maintenance and support. Upon her death, the corpus was to be held in trust for Fred's children and eventually was to be distributed to the children. Shortly after the execution of this will, decedent made two gifts of certain securities to trusts which he created. The first trust was created on March 10, 1969, for the benefit of Alice. Under the terms of this trust, the income was to be accumulated for 20 years and thereafter during the rest of the term of the trust was to be payable to Alice. At the discretion of the trustee, the corpus could be paid to Alice "if in the Trustee's opinion [it was] necessary for her care, maintenance and support or to meet any emergency." The trust was to terminate 25 years from the date of its creation, and, at such time, the corpus was to be distributed to Alice. The trust was funded with 524 shares of International Telephone and Telegraph stock and 300 shares of American Express stock, having an aggregate value of $46,619.50. Fred was named *231 trustee. The second trust was created on March 14, 1969, and it named decedent's three grandchildren as beneficiaries. This trust gave the trustee discretion to pay the principal or income to the grandchildren and further provided that the corpus would ultimately go to them. This trust was funded with the following securities: 1,531 shares International Telephone and Telegraph 424 shares Marathon Oil 300 shares American Express These securities had an aggregate value of $117,113. Fred was also named trustee of this trust. The gift tax liability resulting from the two transfers in trust was $23,114.81. Fred loaned decedent the funds with which to pay this gift tax liability. At decedent's death the loan had not been repaid and was listed on the estate tax return as a debt owed by decedent. On February 28, 1971, decedent executed a new will, revoking the 1969 will. Under the terms of the 1971 will, decedent bequeathed his entire estate to Fred. The will provided that, in the event Fred should predecease decedent, a trust for life in favor of Alice would be created out of decedent's residuary estate, with remainder interest to go to decedent's grandchildren. Since 1948 *232 Fred and Stephen Roth (Roth) had operated Rudin & Roth (R & R), a manufacturer of men's, women's, and children's hosiery. Each owned 50 percent of the voting stock [2]/ of R & R and affiliated companies. The companies had over 400 employees in New York and in various plants in the Southern United States. During 1966, friction developed between Fred and Roth over company operating policies, and Roth invoked their buy-sell agreement which would have required the company to make certain payments to him. The R & R controller informed Fred and Roth that R & R had insufficient resources to make the required payments. As a result of the intervention of a banker, Fred and Roth agreed to maintain the statusquo with each owning 50 percent of R & R's voting stock.
The disagreements between Fred and Roth continued, and on October 24, 1968, they executed a new buy-sell agreement. On January 10, 1969, Roth gave Fred notice of his intent to sell his interest in R & R. This notice required Fred either to cause R & R to purchase Roth's stock or to find an outside purchaser. *233 Fred immediately sought a purchaser of Roth's interest in R & R. Fred and Sol Scheiman began negotiations and agreed on the terms of the sale in early 1969. The sales contract was executed on March 25, 1969, and the transaction was closed in October 1969. The agreed upon price for Roth's interest was $1,200,000. During his later years, decedent had a series of medical problems. In 1961, he suffered a stroke from which he recovered with no substantial impairment to his overall health. In 1965 decedent suffered from upper gastro-intestinal bleeding and, as a result, was hospitalized for a period of 2 weeks. During this hospital confinement, decedent was diagnosed as having hypertensive cardiovascular disease and was treated for the disorder. The treatments were generally successful. In 1967, decedent suffered a second stroke and was hospitalized. At the same time, decedent suffered from hypertension, congestive heart failure, and calcified gallstones. From 1967 until his death, decedent also suffered from Paget's disease, a disorder of the skeletal structure which impaired his ability to walk and was so debilitating that he could not get out of bed without help. As a result *234 of the Paget's disease, decedent could walk only with great difficulty and usually moved about with the aid of a walker or wheelchair. Decedent also suffered from emphysema as well as arteriosclerotic heart disease, and cystitus. The pathologist's report described the cause of his death as a ruptured aortic aneurysm. In September 1967, decedent was admitted to Five Towns Nursing Home where he remained until his death in 1971. Although decedent could have lived in his own home, he would have required the services of a housekeeper to assist him in his everyday functions. Decedent was aware of and concerned about his health.
With the exception of a few occasional gifts to his family, decedent had no history of gift giving prior to 1969. The two 1969 transfers in trust amounted to approximately 40 percent of his assets. Throughout his later years, decedent continued to be interested in his financial affairs and took great care in following the performance of the stock market and in handling his banking matters. Respondent determined that the two 1969 transfers in trust were gifts made in contemplation of death and were therefore includible in decedent's gross estate under *235 section 2035. OPINION Section 2035(a) [3]/ provides in general that a decedent's gross estate shall include the value of all property transferred by such decedent in contemplation of death. Section 2035(b) provides that a transfer within 3 years of a decedent's death, unless shown to the contrary, will be deemed to have been made in contemplation of death. Because the transfers here in question occurred within 3 years of decedent's death, the provisions of section 2035(b) place the burden on petitioner to dispel the presumption that the transfers were made in contemplation of death. *236 Section 20.2035-1(c), Income Tax Regs., provides that the phrase "in contemplation of death"-- does not have reference to that general expectation of death such as all persons entertain. * * * A transfer "in contemplation of death" is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. * * * These regulatory guidelines pose a question of fact requiring an examination of all relevant evidence surrounding the transfer. This inquiry must be focused on determining decedent's dominant motive at the time the transfers were executed. United States v. Wells, 283 U.S. 102 (1931). Petitioner's burden therefore is to establish by a preponderance of the evidence that the motives prompting the questioned transfers were not "associated with death." Section 20.2035-1(c), Income Tax Regs.
Upon consideration of all the relevant facts, we find that the two gifts in trust were made by decedent *237 in contemplation of death.In the 10 years prior to his death at the age of 80, decedent was afflicted with numerous medical disorders, including at least two strokes, heart disease, high blood pressure, and a bone disorder known as Paget's disease. While there is some evidence that he had substantially recovered from some of these infirmities, the record also discloses that he was in full possession of his mental faculties and was cognizant of his health problems. In sum, decedent was chronically ill and was aware of that fact, as well as the fact that he was growing very old. He had considerable wealth, kept abreast of his financial situation, and no doubt knew that his estate would owe substantial estate taxes if he retained his property until he died. Prior to the 1969 transfers in trust, decedent had no pattern of substantial gift giving. With the exception of various small gifts to his son and grandchildren, the 1969 gifts, amounting to approximately 40 percent of his estate, were the first large gifts he had made. Moreover, he made the 1969 gifts only a few days after he executed his original will, thus indicating that he was planning the disposition of his property. Under *238 the terms of the 1969 will, he provided that most of his property would go to testamentary trusts for the benefit of his daughter-in-law, Alice, and his grandchildren. These same individuals were the beneficiaries of the two March 1969 intervivos trusts. In other words, within a period of about 30 days, decedent made gifts of approximately 40 percent of his estate and executed a will transmitting the rest of his estate to his daughter-in-law and grandchildren. The inference is that the intervivos transfers were substitutes for testamentary dispositions and thus includible in his gross estate. Petitioner argues that decedent's gifts were made with the "life motive" of providing security for Alice and decedent's grandchildren during a period when Fred was at odds with his associate in his business activities. However, we think this theory is contrived and lacks a factual foundation. First, Fred's efforts to obtain a purchaser of Roth's interest covered a period of months, and it is not clear from the record that Fred had not already reached an agreement in principle with Sol Scheiman, the purchaser, at the time decedent made the transfers in trust. [4]/ The dates of the two *239 sets of written instruments--the trusts of March 10, 1969 and March 14, 1969, and the agreement of March 25, 1969, with Scheiman--were so close in terms of time that, despite petitioner's position to the contrary, we do not think all the details of the purchase could have been worked out during such a short period. Moreover, the terms of the trust instruments are not consistent with petitioner's theory that decedent sought to alleviate Fred's alleged fear that Alice and his children were facing an impending financial disaster. Under the terms of the trust created for Alice, the income was to be accumulated for 20 years. Nothing was payable to her during that 20 years as a matter of right. During *240 that period, the trustee had discretion to distribute the corpus to her only if in his opinion it became "necessary for her care, maintenance and support or to meet any emergency." To provide for the accumulation of the trust's income for 20 years with no assured distribution to her is hardly the kind of arrangement to be expected if decedent's objective was to allay a fear that Fred's business would fail and that she would be in need. Finally, since Fred was decedent's only child, Fred and his family were the natural objects of decedent's bounty. Decedent was 78 years of age in 1969, living in a nursing home, unable to walk without help, and facing the reality that his life was drawing to an end with the knowledge that a large estate tax would be due at his death. Neither Fred nor his family was in immediate need. The 1969 will calling for the creation of testamentary trusts for Alice and the grandchildren gave them fully as much security as the March 1969 trusts. We think the transfers in trust were made as part of his estate plan, formulated in February and March 1969, which called for the transfer of his estate to his daughter-in-law and grandchildren in part by gift and *241 the rest by will. Petitioner's evidence simply is insufficient to overcome the presumption created by section 2035(b) that the transfers in trust were made in contemplation of death. Accordingly, we sustain respondent's determination that the 1969 gifts were made in contemplation of death and must be included in decedent's gross estate under section 2035(a). To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue, unless otherwise noted.
2. /↩ Ten percent of the nonvoting stock had been issued as a profit incentive to a third individual.
3. / SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule.--If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.↩
4. / As to the timing of the transfers and the agreement with Sol Scheiman, Fred testified: MR. LORE: Now when--when were you able to arrive at a contract with respect to this acquisition? A. At the beginning of 1969. Q. Was it before or after the transfers were made to your wife and children? A. The agreement was before and the final contract was after. Q. If I stated that the agreement was dated March 25, would that be correct? A. That is correct. Right.↩